UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| KHALID ALI, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | No. 1:19-CV-00022 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| CITY OF CHICAGO, CHICAGO POLICE | ) | |
| OFFICERS NORA VALDES and JOHN | ) | |
| KELYANA, LIEUTENANT KEVIN | ) | |
| REPPEN, and SERGANT VINCENT VOGT, | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OPINION AND ORDER

This is a case of mistaken identity. In a stroke of very bad luck, Khalid Ali

happened to share the name as the subject of an arrest warrant. In April 2018, he

mistakenly was arrested on that warrant and spent a night in jail before posting bond

the next morning. In this civil-rights lawsuit, 42 U.S.C. § 1983, he seeks damages

from Chicago Police Officers Nora Valdes, John Kelyana, Kevin Reppen, and Vincent

Vogt for making a false arrest by continuing to hold him after it was clear that he

was not the subject of the warrant.[1] R. 26, Second Am. Compl..[2] Ali also brings state

law claims against only the City of Chicago. *Id.* ¶ 30. Lastly, the complaint includes

a *Monell* claim against the City of Chicago, alleging that a City policy prevented him

from posting bond and avoiding the night in jail. *Id.* ¶ 26. The individual officers have

---

[1]The Court has subject matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(2), and supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

[2]Citations to the record are "R." followed by the docket entry number and, if needed, a page or paragraph number.

moved for summary judgment. R. 65, Defs' Mot. Summary Judgment. (The *Monell* claim is apparently headed for trial, as are presumably the state law claims, which appear to be parallel *respondeat superior* claims for the alleged false arrest.) For the reasons explained in this Opinion, the motion is granted in part and denied in part.

## I. Background

The facts narrated below are undisputed unless otherwise noted (and if disputed, the evidence is viewed in Ali's favor).[3]

## A. The Traffic Stop

On June 12, 2017, the Circuit Court of DuPage County issued a civil body-attachment order for an individual named Khalid Ali. DSOF ¶ 7. That other Khalid Ali (not the Plaintiff) had failed to appear in a civil case, so the state court issued what is in effect an arrest warrant for "indirect civil contempt." R. 74-2, DSOF Exh. B, Warrant. On April 15, 2018, Ali (the Plaintiff) made an illegal U-turn while driving his cab on Michigan Avenue in Chicago. DSOF ¶ 8. Officer Valdes, who was patrolling nearby, made a traffic stop to issue Ali a traffic citation. *Id.* ¶ 9. During the traffic stop, Ali gave his driver's license to Valdes. *Id.* ¶ 10. Valdes would later use Ali's driver's license to write a traffic ticket. R. 74-4, DSOF, Exh. D, Valdes Dep. at 9:10–21; *see also* R. 74-5, DSOF, Exh. E, Traffic Ticket. According to the traffic ticket, which relied on information from the driver's license, Ali was 5' 8" and weighed 200 pounds.

---

[3]Citations to the parties' Local Rule 56.1 Statements of Fact are identified as follows: "DSOF" for the Defendants' Statement of Facts [R. 74]; "Pl. Resp. DSOF" for Ali's response to Defendants' Statement of Facts [R. 86]; "PSOF" for Ali's Statement of Facts [R. 86]; and "Def. Resp. PSOF" for Defendants' response to Ali's Statement of Facts [R. 89].

*See* Traffic Ticket. The ticket also reflects that Ali was born in April 1972 and that his address was located on North Harding Avenue in Chicago. *Id.*

While Ali remained in his taxicab, Valdes asked the dispatcher to run a check on Ali's name. PSOF ¶ 4. The dispatcher responded that a "Khalid Ali" was the subject of an outstanding warrant for contempt of court in DuPage County. *Id.* ¶ 5. Valdes then called DuPage County to confirm the warrant, but the County refused to provide confirmation over the telephone. *Id.* ¶ 6. Seeking guidance, Valdes explained the situation to the LEADS desk and also sought advice from her sergeant. *Id.* ¶¶ 8, 9. LEADS is a nationwide database containing the status of driver's licenses and other law-enforcement information, including active warrants. DSOF ¶ 12. Those efforts proved unsuccessful, and Valdes still was unable to confirm the warrant. For his part, not surprisingly, Ali denied any knowledge about the warrant. PSOF ¶ 11.

Meanwhile, Officer Kelyana arrived on the scene to assist. DSOF ¶ 20. Valdes placed Ali under arrest and transported him to the 18th District police station for further investigation. *Id.* ¶ 21. Before leaving for the station, Valdes learned that Ali was carrying more than $400 in cash (this is important because the bond on the warrant was set for just $150). PSOF ¶ 14. Kelyana continued to ask Ali about the warrant en route to the police station. *Id.* ¶ 15. Ali repeated that he did not know about the warrant, had not missed court anywhere, and had never even been to DuPage County. *Id.* ¶ 16.

### B. Detention at Police Station

Ali arrived at the station at 2:34 p.m. (of course still on the date of arrest, April 15, 2018). PSOF ¶ 21. According to Ali, he spoke to two white-shirted[4] officers who repeatedly asked him about his age. *Id.* ¶ 39. At the station, Kelyana contacted a LEADS representative to confirm the warrant by providing the warrant number contained in the LEADS report and information from Ali's driver's license. DSOF ¶ 32; R. 74-13, DSOF, Exh. M, Kelyana Decl. ¶ 3. Kelyana has averred that the LEADS desk verified the warrant as active and confirmed (whatever that means for the LEADS representative with limited personal knowledge) that Ali was the warrant's subject. Kelyana Decl. ¶ 3. Meanwhile, Valdes completed the Arrest Report at 4:11 p.m. and submitted it to Lieutenant Reppen, the watch operations lieutenant on duty at the time. DSOF ¶¶ 35–36; PSOF ¶ 36. Upon reviewing the Arrest Report, Reppen approved probable cause for arresting Ali at 4:14 p.m. PSOF ¶ 38. But Reppen had no personal contact with Ali on that day. DSOF ¶ 62.

Going back in time a bit, Sergeant Vogt was the desk sergeant on duty when Ali arrived at the station. PSOF ¶ 24. In an important development, Vogt received a fax of the warrant from DuPage County at 3:04 p.m. *Id.* ¶ 27. The top of the warrant named "Khalid Ali" as the respondent and set a cash bond at $150. *See* Warrant. The bottom part of the warrant, which supplied the biographical information needed for the Sheriff to execute the warrant, revealed a residential address (Skokie, Illinois),

---

[4]White uniform shirts have special meaning in the Chicago Police Department: supervisors (like sergeant and lieutenants) often wear white uniform shirts when on duty, PSOF ¶ 40, whereas the video of the arrest shows that line officers (like Valdez and Kelyana) wear blue uniform shirts, R. 74-10.

place of employment (S.A. Auto, also in Skokie), birth date (in 1957), height (5' 7"), and weight (250 pounds) that differed from what was known about Ali from his driver's license and from his own statements. *Compare id. with* Traffic Ticket, R. 74-9, DSOF, Exh. I, Arrest Report. Not surprisingly for a civil body attachment, the warrant had no number or information that would be associated to an individual by their fingerprints. DSOF ¶ 28.

But Sergeant Vogt only reviewed the *top* part of the warrant because he believed that the LEADS Report accurately reflected the contents of the warrant. DSOF ¶ 30. The LEADS Report describes the warrant's respondent as Khalid Ali, a 5' 8" male weighing 167 pounds, and born in 1972 (remember that the warrant itself listed a birth year of 1957). R. 74-8, DSOF, Exh. H, LEADS Report. The LEADS report also listed a driver's license number that matched Ali's. *Compare id. with* Traffic Ticket. And so information in the LEADS Report (as distinct from the warrant) matched with Ali's on birth year, name, sex, and driver's license number. The height was also a close match, but the weight differed by more than 30 pounds. The bottom of the LEADS Report warns, "Confirm with ORA." *See* LEADS Report. This instructs the reader to confirm the information in the Report with the originating agency. DSOF ¶ 24. In any event, Vogt gave final approval to hold Ali on the warrant at 7:01 p.m. *Id.* ¶ 43. In his deposition, Vogt also testified that he had seen an electronic version of the Arrest Report at some point during the evening. R. 74-6, DSOF, Exh. F, Vogt Dep. at 12:8–16. For their part, Valdes, Kelyana, and Reppen deny ever seeing the warrant, though Ali testified that, at one point, "everybody was seeing" a document

that he believed to be the warrant. DSOF ¶ 31; Pl. Resp. DSOF ¶ 31; R. 74-3, DSOF, Exh. 3, Ali Dep. at 33:6–11. This is a key factual dispute discussed in more detail later.

Sometime after 7 p.m. Ali's arrest was processed and he spent the night in custody. DSOF ¶¶ 50, 57. Earlier in the day, Kelyana expressed to Ali his belief that Ali probably could post bond. *Id.* ¶ 52. But Valdes, Kelyana, and Reppen have averred that they had no involvement in the decision to delay Ali's posting of the bond. *Id.* ¶ 54. Vogt has no memory on whether Ali was permitted to post bond. *Id.* ¶ 53. In any event, Ali posted bond the following morning (now April 16) after appearing in the Circuit Court of Cook County. *Id.* ¶ 58. He later appeared in DuPage County, where the state court determined that he was not the Khalid Ali sought by the warrant. *Id.* ¶ 59. The state court ordered that the posted bond be refunded to Ali. R. 74-20, DSOF, Exh. T, DuPage Circuit Court Order.

## II. Standard of Review

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must "view the facts and draw reasonable inferences in the light most favorable to the" non-moving party. *Scott v. Harris*, 550 U.S. 372,

6

378 (2007) (cleaned up).[5] The Court "may not weigh conflicting evidence or make credibility determinations," *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011) (cleaned up), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

### III. Analysis

### A. Motion to file Class Action

Before addressing the merits of the claims against the individual officers, the Court denies Ali's motion to file a third amended complaint in order to add a proposed class action. R. 62. Arguably, the request to amend is governed by the stricter good-cause standard in Civil Rule 16(b), R. 15 (setting Rule 16(b) deadline), but even under Civil Rule 15(a)(2)'s more accommodating interests-of-justice standard, the motion is rejected. First, the request came late in the case: specifically, after *three* extensions, R. 21, 27, 39, the fact discovery deadline expired on December 6, 2019. Ali moved for class certification two days before the close of fact discovery—on December 4, 2019.

---

[5]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

R. 41. This was even before any class-action allegation had even been asserted in the case. By sheer necessity, then, if the class-action allegation were allowed to be added—which the certification motion did not even formally seek—fact discovery would have to be extended again in order for the defense to explore whether certification would meet the requirements of Civil Rule 23. Because of the rarity of moving for class certification without even having alleged a class action, or without having sought to leave to amend the complaint to allege a class action, the Court mistakenly overlooked the absence of the class allegation and set a briefing schedule on the motion. R. 43; *see also* R. 59. Only later did the Court realize its mistake, after the City raised the issue, so the Court terminated the certification motion and instructed Ali to seek leave to amend if he wished to pursue a class action. R. 59. So the delay in seeking leave to pursue the class action two days before the thrice-extended fact-discovery deadline militates against granting permission.

In the same vein, as early as September 20, 2019, Ali was on notice that the defense intended to rely on a Circuit Court-issued General Administrative Order to justify bringing Ali to bond court before allowing him to post bond (instead of just accepting bond at the police station). Specifically, the City disclosed the Administrative Order on September 20, 2019, in response to a supplemental document request. R. 69, Exh. 1 ¶ 1. On the same date, the City also responded to requests to admit, and again directed Ali to the Administrative Order issue by the Chief Judge of the Circuit Court of Cook County. R. 69, Exh. 2 ¶ 2. So it was plain that Ali was probably not alone in being subject to a broad policy requiring an appearance in bond court. At the

8

very least, even if officers have some discretion in implementing the Administrative Order, it was more than a reasonable basis to allege a proposed class action. Instead of proposing it, or even asking for a fact discovery extension in order to pursue it further (though that was not necessary to do before proposing it), Ali dropped the certification bomb with two days left on the discovery clock. Whether the subjective motive was to box out the City from engaging in discovery or not, objectively the delay was not reasonable. Indeed, ultimately, the motion to file the third amended complaint was not filed until February 12, 2020. R. 62. The in-between time was consumed by the City's motion to strike the certification motion and Ali's resistance to that motion.

Although Ali argues that the defense would suffer no prejudice from the amendment, adding the class-action allegation obviously would greatly expand the case from a single-plaintiff, overnight-jail case to potential liability for a class that Ali estimated at *2,942* arrestees. R. 41 at 5. No doubt too that potential liability of that scope would justify substantial and extended discovery on the propriety of class certification. On the eve of the eve of discovery (that is, two days before the end), then, Ali proposed to radically expand the case without warning. The defense also credibly explains that it would have seriously considered making a much earlier Rule 68 offer of judgment to cut off (or at least tamp down) attorney's fees, given the relatively low compensatory damages in an overnight-jail-stay case (there is no corresponding unconstitutional jail-conditions claim, just the overnight stay). All in all, Ali is still able to pursue his individual claims without the substantial prejudice that the defense

9

would experience if permission was granted. The motion for leave to amend is denied.[6]

## B. Probable Cause

Moving on to the merits, Ali first contends that his continued detention post-arrival of the warrant violated his Fourth Amendment right against unreasonable seizures. R. 87, Pl. Resp. at 9. He clarifies that his false-arrest claim does not begin until 3:04 p.m. (on the date of the arrest, April 15, 2018), which is when Vogt received the warrant via fax from DuPage County. *Id.* at 3. In other words, Ali advances no challenge to the arrest on Michigan Avenue, or his continued detention en route to the police station. *Id.* The warrant's arrival is the key turning-point moment when, according to Ali, there was no longer probable cause to detain him.

A law enforcement officer violates the Fourth Amendment if the officer seizes a person unreasonably; here, that means without probable cause. *See Bentz v. City of Kendallville,* 577 F.3d 776, 779 (7th Cir. 2009). Probable cause exists "if the totality of the facts and circumstances known to the officer at the time of the arrest would warrant a reasonable, prudent person in believing that the arrestee had committed, was committing, or was about to commit a crime." *Abbott v. Sangamon Cnty., Ill.,* 705 F.3d 706, 714 (7th Cir. 2013) (cleaned up). When police officers mistake a person for someone they seek to arrest, the arrest still complies with the Fourth Amendment "if the officers (1) have probable cause to arrest the person sought; and (2) reasonably

---

[6]Ali relies again on *Chapman v. First Index, Inc.*, 796 F.3d 783, 785 (7th Cir. 2015), to argue that he did not need to give any notice to the defense that he was pursuing a class action. That argument is rejected for the same reasons already discussed in the order of January 29, 2020. R. 59.

believe that the person arrested is the person sought." *Catlin v. City of Wheaton*, 574 F.3d 361, 365 (7th Cir. 2009).

Because Ali limits the false-arrest claim to the time *after* the warrant arrived at the police station, *see* Pl. Resp. at 6, the question in this case is whether each individual officer could still reasonably believe after the warrant's arrival, given the facts and circumstances, that Ali was the person sought by the warrant.

### 1. Sergeant Vogt

Sergeant Vogt contends that he was entitled to rely fully on the LEADS Report to find probable cause, even though he received a copy of the warrant which contained different identifying information. Def. Br. at 6. Remember that Vogt only reviewed the top half of the warrant—which basically only contained the name Khalid Ali— and determined probable cause existed because he believed that Ali's identifying information matched that of the LEADS Report. DSOF ¶¶ 30, 44–45. Remember that the bottom half of the warrant—which listed the biographical information of the sought-after Khalid Ali—would have shown discrepancies with the LEADS Report in birth year (by 15 years) and weight (by a significant difference of 83 pounds). *Compare* Warrant *with* LEADS Report.

Vogt argues that he could simply rely on the LEADS Report to find probable cause under the warrant—even if he had reviewed the entire warrant. Def. Br. at 6. To support this proposition, Vogt cites *Lauer v. Dahlberg,* 717 F.Supp. 612 (N.D. Ill 1989), but the circumstances there are distinguishable from this case. In *Lauer*, the

arrestee (later turned plaintiff) provided the arresting officer with a copy of a purported order that supposedly recalled the warrant. *Id.* at 613–14. *Lauer* held that the officer still had sufficient probable cause to effectuate the arrest because it was objectionably reasonable to believe that the warrant remained active. *Id.* The officer had conducted a LEADS check, contacted central dispatch, and inquired about the warrant once he transported the arrestee to the police department. *Id.* at 613. Each inquiry revealed that the warrant was still active. *Id.* Plus, the purported recall order was not certified. *Id.* at 614. So *Lauer* did not even involve a dispute over whether the plaintiff was the person sought by the warrant. The issue there was whether the officer had reason to believe that the warrant remained active. It is one thing to rely on LEADS (and other sources) for probable cause that a warrant is still active. It is quite another to rely on LEADS to conclude that the arrestee is the subject of a warrant without matching the information on LEADS to the warrant with a quick glance at the bottom half of the warrant.

Similarly, the Defendants' reliance on *Hernandez v. Sheahan*, 455 F.3d 772 (7th Cir. 2006), is also unpersuasive. *Hernandez* involved a *Monell* claim alleging that the City of Chicago ought to have, in essence, a triple-check on the identity of an arrestee when compared to the warrant. *See id.* at 775. *Hernandez* presented a very different challenge because the plaintiff and the warrant's target in that case *matched* in birthdays, as well as "sex, height, weight, and eye color." *Id.* at 773. So the Seventh Circuit confronted a request, in effect, by the plaintiff to believe all arrestees when they deny that they are the warrant's target. Here, Ali's false-arrest

12

claim is premised on checking the actual warrant after it arrives at the station (remember, he limits the claim to after the warrant's receipt), especially where the LEADS Report itself contains a significant mismatch with the arrestee (167 pounds versus 200 pounds) and warns to "confirm with ORA," that is, to confirm with the originating agency.

Vogt relies on three more cases to absolve him of the false-arrest claim. Def. Br. at 6. First, in *Tibbs*, the Seventh Circuit held that an officer had probable cause to make a mistaken arrest despite discrepancies between the warrant and the arrestee's driver's license. *Tibbs v. City of Chicago*, 469 F.3d 661, 665 (7th Cir. 2006). There, an officer stopped a man who fit the description of a suspicious person who was reportedly loitering in the area. *Id.* at 662. The man produced a valid driver's license identifying him as "Ronald A. Tibbs" born on October 14, 1955. *Id.* The squad-car computer returned an unexecuted traffic warrant for a man named "Ronald L. Tibbs" born on January 9, 1949. *Id.* The Seventh Circuit affirmed summary judgment for the officer despite the discrepancies between the middle initial and the six-year-age difference. *Id.* at 665. Also, the officer's reasonable belief was bolstered by the arrestee's statement when questioned about the warrant. *Id.* 662–63. The arrestee, thinking that the officer was referring to a different traffic violation that he had committed, unwittingly acknowledged the warrant. *Id.*

In contrast, Ali repeatedly disclaimed any knowledge of an outstanding warrant out of DuPage County. PSOF ¶¶ 11, 16–17. It is not clear whether Vogt ever learned of Ali's protestations, but it is not as if Ali confessed to Vogt that he was the

subject of the warrant. More importantly, the warrant's information was starkly different from the information about Ali (at least a reasonable jury could so find), and Vogt acted unreasonably in failing to check the bottom-half of the warrant.

In *Phelan v. Village of Lyons*, 531 F.3d 484 (7th. Cir. 2008), the Seventh Circuit held that an officer did *not* act reasonably by reading only the first two lines of a LEADS report when arresting the plaintiff for driving a stolen car. *Id.* at 488 (cited by Pl. Resp. Br. at 10). If the officer had simply read the third line of the report, then he would have realized that the suspect had stolen a *motorcycle*. *Id.* The court could not "ignore the information contained in the third line," which appeared on the very same screen as the first two lines. *Id.* And had the officer read past the second line "he would have realized, at the very least, that further investigation was warranted." *Id.* The sensible principle in *Phelan* is consistent with the Seventh Circuit's admonition to officers: when determining probable cause, officers should not "close [their] eyes to facts that would clarify the situation." *McBride v. Grice,* 576 F.3d 703, 707 (7th Cir. 2009); *see also Guzell v. Hiller,* 223 F.3d 518, 520 (7th Cir. 2000) ("Police must act reasonably on the basis of what they know ... [and] they can't close their eyes to [ ] additional information.").

Indeed, as a factual matter too, according to Lieutenant Reppen, it was Sergeant Vogt's responsibility as desk sergeant to determine whether an arrestee was being erroneously held on a warrant. PSOF ¶ 29. Had Vogt simply moved his eyes to the bottom of the warrant, he would have noticed a 15-year age gap (1957 on the warrant versus 1972), different addresses in different cities (Skokie on the warrant

14

versus Chicago),[7] and at least a 50-pound weight difference (250 pounds on the warrant versus 200). Given these facts, a reasonable jury could find no probable cause remained to hold Ali after the warrant's arrival.

The other cases cited by Vogt do seem to present even worse circumstances for the hapless arrestees, but the cases in fact do not support Vogt's position. In *Johnson v. Miller*, the plaintiff (Johnson) was mistakenly arrested *twice*. 680 F.2d 39, 40 (7th Cir. 1982). There, a woman named Annette Jenkins defrauded a bank using the plaintiff's savings account. *Id.* Although the bank had figured out Jenkins had committed the fraud, it also filed a criminal complaint against Johnson and—crucially—gave Johnson's home address to the police. *Id.* The police issued an arrest warrant for a "Miss Johnson," described as a 5' 7" black woman born on February 5, 1951. *Id.* But the plaintiff was a 5' 5" white woman born on May 2, 1951. *Id.* Despite the differences, an officer executed the warrant and arrested Johnson at her home (remember that the bank supplied the home address to the police). *Id.* At a preliminary hearing, the court cleared Johnson and ordered the warrant to be reissued. *Id.* The new warrant, however, was exactly the same as the first—which meant that Johnson's home address was still on it—except that (worse) it now matched the plaintiff's birthdate. *See id.* A second officer, even though he knew about the prior arrest, arrested Johnson at her home for a second time. *Id.* For a second time, she was dismissed after going through the same routine in court. *Id.*

---

[7]Compare the LEADS Report (R. 74-8) and the Arrest Report (R. 74-6), the latter having been reviewed by Vogt on a computer, *see* DSOF ¶ 44, Vogt Dep. at 12:8–16, with the Warrant (R. 74-2).

15

Although the Seventh Circuit described the government's conduct as "outrageous," it held that neither of the arresting officers had committed a false arrest under the Fourth Amendment. *Johnson*, 680 F.2d at 42. The appeals court reasoned that the arresting officers were simply executing an arrest warrant containing false information caused by someone else's negligence. *Id.* at 41–42. Remember that Johnson's home address was on the warrant, and the officers simply went to her address and arrested her there both times. *Id.* at 40. The Seventh Circuit decided on the "practical ground" that the Fourth Amendment should not force arresting officers to "backstop the mistakes of their superiors." *Id.* at 42.

Just so in the other false-arrest cases cited by the Defendants. Each time, the Seventh Circuit relied on similar practical considerations to conclude that probable cause still supported the mistaken-identity arrests. In *Patton*, the arrestee's name and race matched, and the police were confronted with an on-the-scene decision to arrest the plaintiff. *Patton v. Przbylski*, 822 F.2d 697, 698–700 (7th Cir. 1987) (highlighting "practical dilemma[s]," "confused and ominous circumstances," and "the edginess that all policemen feel in confronting a criminal suspect"). Another case involved a warrant that sought a dangerous felon who was a flight risk. *Catlin*, 574 F.3d at 365–66 (officers had probable cause for mistaken arrest where warrant matched description of the plaintiff's motorcycle and officers believed that they were apprehending a felon who presented an escape risk). Other decisions presented similar on-the-scene decisions or involved closer matching information. *White v. Olig*, 56 F.3d 817, 820 (7th Cir. 1995) (concluding it would be "imprudent" for an officer to

release plaintiff despite discrepancies in race and height); *Brown v. Patterson*, 823 F.2d 167, 169 (7th Cir. 1987) (officer would have been "imprudent" not to arrest plaintiff whose name matched suspect's alias, was close to suspect in age, and shared the same race and gender).

All these cases involve officers either following the instructions on the warrant or making spur-of-the-moment arrests on the scene. In contrast, as discussed earlier, Ali limits the false-arrest claim to after the warrant's receipt by Vogt in the police station. Vogt was not trying to decide (as Valdes and Kelyana were in the first instance) whether to take Ali into custody amongst the hustle and bustle of Michigan Avenue in the early afternoon. Instead, Vogt was the desk sergeant specifically assigned to decide, after receipt of the warrant in the police station with Ali already in custody, whether to approve the continued detention of Ali. DSOF ¶¶ 42–44; PSOF ¶ 29. And unlike the officers in *Johnson*, he was not being asked to backstop superiors who received faulty information in crafting the warrant in the first place. *Johnson*, 680 F.2d at 40 (explaining that the victim-bank supplied the plaintiff's home address). Vogt simply failed to review all of it. DSOF ¶ 30. Nor was Vogt (or any of the officers, for that matter) confronted with a suspected dangerous felon or someone who presented a flight risk. Indeed, not many criminal offenses for which warrants are issued are less serious than "indirect civil contempt" for failure to appear in a civil case. R. 74-2, Warrant. The alleged crime literally arose in a civil-case context. On these facts, viewing the evidence in the light most favorable to Ali, a reasonable jury

17

easily could find that a reasonable officer in Vogt's position no longer had probable cause to hold Ali after the warrant arrived.

That does not end the analysis, however, because Vogt also argues that he is protected from monetary damages by qualified immunity. Qualified immunity protects public officials from liability for damages if their actions did not violate clearly established rights of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To defeat qualified immunity, a plaintiff must establish both that (1) the defendant violated a constitutional right and (2) the right was clearly established. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). In false-arrest cases, qualified immunity provides officers with an additional layer of protection, because even if a jury can find lack of probable cause on a given set of facts, the question still is whether a reasonable officer would have mistakenly believed that the arrest lacked probable cause. *Williams v. Jaglowski*, 269 F.3d 778, 781 (7th Cir. 2001); *Humphrey v. Staszak*, 148 F.3d 719, 725 (7th Cir. 1998). If an officer had even "arguable probable cause" to arrest the plaintiff, then qualified immunity applies. *Williams*, 269 F.3d at 781.

The problem for Vogt is that the stark differences between the warrant and Ali himself refute that Vogt had even "arguable probable cause" to continue to detain Ali. To repeat, the warrant sought someone who was born in 1957 (not 1972) and weighed 250 pounds (not 200 pounds), and who lived and worked in Skokie, not in Chicago. *See* Warrant. Also, the video shows what Ali looked like on the date of the arrest, and he simply does not look like he was 60 years old at the time, and certainly not 250

18

pounds. R. 74-10, Valdes Body Camera Video. And it was clearly unreasonable, in light of *Phelan,* to fail to read the bottom part—really, the crucial part with the respondent's biographical information—of the warrant. 531 F.3d at 488. Given the facts and the governing law, this was not a close enough call to justify the application of qualified immunity.

### 2. Officers Valdes and Kelyana

Ali does not contest that Valdes had probable cause to make the initial traffic stop. Pl. Resp. at 3. Neither does Ali contest the detention on Michigan Avenue, the decision to go to the police station, or even the detention in the station until the warrant's arrival. *Id.* So the question as to Valdes and Kelyana is whether the evidence would allow a reasonable juror to infer that Valdes and Kelyana (in addition to Vogt) became aware of the discrepancies between the warrant and Ali. This possibility arises from the fact that Valdes and Kelyana stuck around to help process the arrest after transporting Ali to the police station. Valdes wrote the Arrest Report and also wrote the traffic citation issued to Ali. DSOF ¶ 34. Kelyana contacted a LEADS representative to confirm that the warrant was valid. *Id.* ¶ 32. Both Valdes and Kelyana assert, however, that they (a) never saw the warrant, *id.* ¶ 31, and (b) had no involvement with Ali's detention after his arrest was processed, *id.* ¶ 61.

In response, Ali contends that Valdes and Kelyana saw the warrant. Pl. Resp. DSOF ¶ 31. Along with some surrounding circumstances, Ali relies on his deposition testimony, in which he said that "everybody was seeing" a piece of paper that, in context, appears to have been the warrant. *Id.*; Ali Dep. at 32:23–33:21. Ali described

being asked about the information on the warrant, and he says that everybody in the immediate vicinity was looking at this piece of paper. *Id.* 33:2–13. But Ali's deposition testimony does not establish, even circumstantially, that Valdes was among those officers. Throughout Ali's deposition, he refers to Valdes as the "female" officer. *See Id.* at 29:6–17 ("When we got to the police station, the female officer opened the door and then we went inside the police station in the back."). Ali testified that while he was handcuffed to a wall, an officer wearing a white shirt (as opposed to a uniformed officer, such as Valdes) came in with "the paper." *Id.* at 31:5–7. He further testified that another "male officer" said to him "now we know why you are here … somebody sued you and it's [a] civil suit." *Id.* at 31:7–11. Later on, Ali appears to refer to this second male officer as the "blue" officer. *Id.* at 33:6–11. According to Ali, the blue officer received the "paper" from the white-shirted officer. *Id.* at 33:8–10. It is in this context that Ali testified that "they was taking [it] from each other. Everybody was seeing it." *Id.* at 33:9–11. Later in the deposition, Ali revisited this episode and added only that "the female police officer, she was in the computer. But the two who were having the paper that I saw, it was the white shirt police officer and the uniform police officer." *Id.* at 43:6–9. Even read with its surrounding context, and even giving reasonable inferences to Ali, no reasonable jury could find that Valdes was part of the "everybody was seeing"-the-warrant event. That would just be speculation. In fact, Ali testified that "the female officer" was on the computer when the white and blue uniformed officers entered the room with "the paper." *Id.* The summary judgment

record is insufficient to rebut Valdes's specific disavowal of ever seeing the warrant. The claim against Valdes is dismissed.

Kelyana is a different story. For him, a reasonable juror could infer from Ali's testimony that Kelyana saw the warrant. Throughout his deposition, Ali refers to Kelyana as "the male officer." *See* Ali Dep. 25:20 ("The male officer talked to me."). He also described him as having a blue uniform, *id.* at 22:17–19, which is consistent with Kelyana's non-supervisory position. Indeed, video footage from Valdes' body camera confirms that Kelyana was wearing a blue-colored shirt underneath his jacket when speaking with Ali at the scene on Michigan Avenue. *See* Body Camera Video. Of the two officers who came with "the paper," Ali described one as either "the male officer" or "the blue one." *Id.* at 31:8, 33:6–7. Also, at one point, the "blue" officer received "the paper" from the "white shirt police officer." *Id.* at 33:6–9. So a reasonable jury could infer that Kelyana was the blue-uniformed officer who also reviewed the warrant. Indeed, this officer (who reasonably could be determined to be Kelyana) asked Ali if he had "clean[ed] motors." *Id.* at 31:12. This likely was prompted by the warrant's listing for place of employment as "S.A. Auto." *See* Warrant. The same officer also asked if Ali had ever been to Skokie, which again probably corresponds to the residential and employment address listed on the warrant. Ali Dep. at 31:13; *see* Warrant. At the very least, a reasonable juror could infer that this officer was Kelyana and that he had read the warrant (including its bottom half).

In light of that potential finding by the jury, much like Vogt, that after receipt of the warrant (and apparently reading it), a jury also could find that a reasonable

officer in Kelyana's position did not have probable cause to continue to detain Ali. There were too many stark discrepancies between the warrant and Ali, especially given Kelyana's *personal observations* of Ali. Kelyana directly interacted with Ali throughout the April 15 stop and arrest. *See* Body Camera Video. And if Kelyana read the warrant, then he was in a position to observe, for example, that Ali did not look like he was 60 years old or weighed 250 pounds. *See* Warrant. Ali also protested directly to Kelyana that he knew nothing about the warrant. PSOF ¶¶ 15–16. Like Vogt, Kelyana was no longer in a time-pressured environment trying to make an on-the-scene decision. Nor was Kelyana dealing with a warrant issued for a serious crime or dealing with a suspect who represented a flight risk.

Similar to Vogt, Kelyana also is not entitled to qualified immunity. The differences were too stark to characterize this as a case of arguable probable cause. A reasonable officer would have known that there was insufficient probable cause to believe that the much younger, much lighter, non-Skokie resident was not the Ali sought by the warrant. The false-arrest claim against Kelyana survives.

### 3. Lieutenant Reppen

The summary judgment record does not establish, even giving Ali the benefit of reasonable inferences, that Officer Reppen saw the warrant, so the false-arrest claim against him must fail. Reppen was the watch operations commander on duty when Ali was brought to the station on the day of the arrest. DSOF ¶ 37. Based on a review of the Arrest Report, Reppen gave initial approval of probable cause to arrest Ali under the warrant. DSOF ¶¶ 38–39. The Arrest Report accurately describes Ali's

actual height, weight, age, address, and driver's license. *See* Arrest Report. Reppen avers that he had no personal contact with Ali. *Id.* ¶ 62; R. 74-16, DSOF, Exh. P, Reppen Decl. ¶ 5. The most that Ali has on that front is Ali's previously discussed testimony to the effect that "everybody was seeing" the warrant. Pl. Resp. DSOF ¶ 31.

So the question is whether a reasonable jury could infer that Reppen was one of the officers who approached Ali with "the paper." *See* Ali Dep. at 43:6–9. The answer is no. To start, Ali actually does not dispute Reppen's assertion that Reppen had no personal contact with Ali on April 15, 2018. *See* Pl. Resp. DSOF ¶ 62. Also, the record does not suggest that Reppen was the "blue"-shirted male officer. *Id.* at 31:7–11; 33:6–11. As Ali acknowledges, generally sergeants and lieutenants in the Chicago police department wear white shirts (if they are not working undercover). PSOF ¶ 40. On the date of Ali's arrest, Reppen held the rank of lieutenant. R. 74-11, DSOF, Exh. K, Reppen Dep. at 4:12.

The record does not establish Reppen as the white-shirted officer either. Ali Dep. at 31:5–7. During his deposition, Ali described the white-shirted officer as having a similar height as Ali and weighing around 200 lbs. *Id.* at 32:13–22. But without any other evidence in the summary judgment record describing Reppen's appearance, a reasonable jury could not place Reppen among the officers who saw the warrant. Process of elimination might have been enough circumstantial evidence, but Ali offered no evidence on how many supervisors (that is, how many people were probably wearing white shirts) were at the police station at the time Ali was held there. So

nothing but speculation supports a finding that Reppen reviewed the warrant or would otherwise be expected to do so. Reppen too is dismissed from the case.

### C. Delay in Posting Bond

Moving on from the false-arrest claim based on the warrant, Ali also alleges that the Defendants violated the Constitution by denying him an opportunity to post bail promptly. Pl. Resp. at 11. He fashions this claim as a challenge under the Fourth Amendment, not the Due Process Clause of the Fourteenth Amendment. *Id.* In any event, the Seventh Circuit, unlike other circuits, has not recognized a "substantive due process protection liberty interest" that "attaches once arrestees are deemed eligible for release on bail." *Steele v. Cicchi*, 855 F.3d 494, 502 (3d Cir. 2017); *see also Dodds v. Richardson*, 614 F.3d 1185, 1192 (10th Cir. 2010), *Campbell v. Johnson*, 586 F.3d 835, 840 (11th Cir. 2009). Moreover, the Supreme Court held in *Manuel* that the Fourth Amendment generally governs a claim for unlawful pretrial detention. *Manuel v. City of Joliet, Ill.,* 137 S. Ct. 911, 920 (2017).

Delay of Ali's bond gives rise to a stand-alone Fourth Amendment claim only if it is assumed that the Defendants *had* probable cause to keep him overnight under the warrant. Any individual Defendant who *lacked* probable cause to detain Ali after the warrant's arrival would be responsible for the overnight detention, which would render the posting of the bond neither here nor there. More importantly, as a stand-alone Fourth Amendment claim based on the delay in posting bond, the individual Defendants are entitled to summary judgment both on the grounds of qualified immunity and lack of personal involvement in causing the alleged delay.

24

First, on whether the right to post bond before an overnight stay is clearly established, the best case that Ali cites is an unpublished district court decision. In *Alcorn*, the district court concluded that the arrestee-plaintiff sufficiently alleged that officers detained him without probable cause. *Alcorn v. City of Chicago*, 2018 WL 3614010, at *7 (N.D. Ill. July 27, 2018). But the factual context of *Alcorn* is night-and-day from this case. There, officers arrested the plaintiff on an out-of-county warrant. *Id.* at *8. Once officers learned that the plaintiff could post the $50 cash bond, they brought a new *non*-bondable charge based on *falsified* reports. *Id.* So *Alcorn* had no occasion to address how long an arrestee can be held on a bondable offense when the arrestee is ready and able to post the bond. Instead, not surprisingly, the holding of *Alcorn* was that the officers lacked probable cause to continue to detain the arrestee based on false charges. *Id.* No clearly established right to promptly post bond is discernable from *Alcorn*.

The second flaw in Ali's bond-posting claim against the individual Defendants is that the evidence does not establish that any of them were personally responsible in delaying his chance to post bond. Ali offers no affirmative evidence that any of the individual Defendants had any control over when Ali would be allowed to post bond. Officers Valdes and Kelyana, as well as Lieutenant Reppen, each testified that they never told Ali that he could not post bond, and were not involved in any decision with regard to his bond. DSOF ¶ 54. Vogt did not even remember whether Ali was permitted to post bond. *Id.*¶ 53. Ali must establish that the individual Defendants were personally responsible for delaying the opportunity to post bond, *see Thurman v. Village*

*of Homewood,* 446 F.3d 682, 687 (7th Cir. 2006) ("A cause of action under § 1983 requires a showing that the plaintiff was deprived of a right secured by the Constitution or federal law, by a person acting under color of law."), but Ali offers no evidence to affirmatively establish this or to rebut what the Defendants have offered.

In objecting to the Defendants' averments that they were not involved in the delay in posting bond, DSOF ¶ 54, Ali asks the Court to reject what he deems "patch-up" declarations submitted by the Defendants after their depositions. Pl. Resp. DSOF ¶ 54. It is true that outright inconsistencies in an affidavit executed after a deposition cannot walk back admissions made in a deposition, at least absent a persuasive explanation that a jury can credit. But the affidavits do not directly contradict anything in the depositions. Indeed, the defense position that they had no personal control over positing bond in a police station—as opposed to waiting for a court hearing—is buttressed by Cook County Circuit Court General Administrative Order No. 2015-06. That Administrative Order provides that "[d]efendants taken into custody by an arresting agency located within Cook County on an arrest warrant issued by an Illinois state court outside of Cook County shall be *required to appear in bond court* in the appropriate district or division of this court." DSOF ¶ 55 (emphasis added). So, at the least, reasonable officers would be able to rely on the Administrative Order without violating a clearly established right (again, Ali does not point to a specific case establishing the right in these circumstances). To be sure, Ali disputes the binding nature of the order, Pl. Resp. DSOF ¶ 55, but that would not undermine the lack of clarity in following the Administrative Order and transporting Ali to bond court. (The *Monell*

26

claim against the City can be pursued by Ali without the burden of qualified immunity.)

For all those reasons, the Fourth Amendment claim against the individual Defendants premised on the delay in posting bond is dismissed.

### D. Fourteenth Amendment

Finally, to the extent Ali previously alleged stand-alone Fourteenth Amendment claims, those claims do not survive because none are adequately advanced—leaving aside, of course, that the Fourth Amendment is held applicable to state actors via the Due Process Clause of the Fourteenth Amendment. According to Ali's summary judgment briefing, all challenges to his overnight detention are advanced as Fourth Amendment claims. *See* Pl. Resp. at 6, ("[a]s explained more fully below, a jury could find that this decision violated the Fourth Amendment"), 9 ("[t]he decision of the Supreme Court in *Manuel v. City of Joliet* … requires that plaintiff's claim be evaluated by the objective reasonableness standard of the Fourth Amendment"), 12 (defendants' decision to refuse to permit plaintiff to post bail violated the Fourth Amendment). Nothing in Ali's response brief, or his factual submissions, develops a contention that his right to equal protection, substantive due process, or procedural due process are at issue.

### IV. Conclusion

For the reasons explained above, Ali's motion to amend the complaint is denied. The Defendants' motion for summary judgment is granted in favor of Valdes

and Reppen in full; in favor of all the Defendants on the bond-posting claim; but denied as to Vogt and Kelyana for the false-arrest claim after the warrant's arrival at the police station. The tracking status hearing of December 11, 2020 is reset to December 18, 2020, at 8:30 a.m., but to track the case only (no appearance is required, the case will not be called). Instead, the parties shall initiate settlement negotiations, confer on the next step of the litigation, and file a joint status report on December 11, 2020.

ENTERED:


s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge


DATE: November 30, 2020